## PRELIMINARY STATEMENT

This matter is before the Court in connection with the Motion for Summary Judgment of the Burlington Township ("Township") defendants pursuant to Fed. R. Civ. P. 56. This Brief is being submitted in further support of defendant's Motion for Summary Judgment.

## ARGUMENT

*I.*   **SINCE JUDICIAL IMMUNITY APPLIES, THE COURT SHOULD ENTER AN ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS**

In the Opposition to the Township defendants' Motion for Summary Judgment, plaintiff argues that the alleged Township policy requires a municipal defendant who asserts an inability to satisfy the minimum payment at the Burlington Township Municipal Court's ("BTMC") violations window to complete a certified financial questionnaire declaring assets, income, and expenses. Plaintiff also alleges that the individual will be instructed by court personnel and also Judge McInerney to make a phone call to ask a third party for money to pay their fine and fees and that "in the event that such a phone call yields no benefactor, or when an individual states that they have no one that they can call, it is Defendants' policy to deny such individuals their constitutionally mandated opportunity to prove their indigency and inability to pay". However, plaintiff has offered no proof of the implementation of an impermissible policy or practice beyond plaintiff's own assertion. (See Exhibit "4" attached to Judge McInerney's Opening Brief, pp. 77:1-80:25)

Plaintiff refers to the Matthews sign as demonstrating the policy. (See Exhibit "17" attached to Township Defendants Opening Brief, p 30:4-12.) It is unchallenged that Judge McInerney had no knowledge of the sign's existence. It had come from the City of Burlington Municipal Court. He only became aware of it following plaintiff's Complaint. After receiving the Complaint, he went out, looked at the sign, and directed that it be removed immediately. He

1

told them to take it down because it was not the Court's policy. He explained that they follow the AOC policy. The Judge stated that if the defendant is not able to make a payment that day, other arrangements are made for payment. (See Exhibit "19" attached to Township Defendants Opening Brief, p. 43:4-45:14). Plaintiff has offered no proof that this alleged policy was enforced.

Judge McInerney also explained that procedures are set by the AOC. With regards to plaintiff's fine, Judge McInerney felt that plaintiff's actions evidenced a lack of candor. Plaintiff was unwilling to make a phone call, and was trying to avoid payment of the fine. It was obvious to the Court that plaintiff was not taking the matter seriously. When the Court asked plaintiff if he would make a payment, plaintiff indicated that he would not. (See Exhibit "11" attached to Township Defendants Opening Brief, pp. 38:1-40-25)

Judge McInerney testified that, in retrospect, his reaction to the disrespectful conduct of plaintiff in Court was perhaps too punitive, and upon reflection he should have handled the matter differently. The Judge asked the Court Administrator if plaintiff was still in the back as he wanted plaintiff to return to the courtroom. However, plaintiff had already paid his fines and left. Judge McInerney never intended for plaintiff to go to jail. His intention was to speak to plaintiff again on the record, and make some arrangement for payment of the fine. He indicated that he rarely sentences people to jail. (See Exhibit "13" attached to Township Defendants Opening Brief answer to Interrogatory No. 2; pp. 100:12-102:4)

Plaintiff wishes to dispute the wisdom of Judge McInerney's decision to sentence plaintiff to jail for five days. However, such dispute is pointless as his decision is protected under judicial immunity. See, Figueroa, 208 F. 3d 435 (3d Cir. 2000), citing Mireles v. Waco, 502 U.S. 9 (1991). Plaintiff has presented no evidence that there was a policy in place authorized by Judge

McInerney which takes his actions outside the scope of judicial immunity. Accordingly, defendants Motion for Summary Judgment should be granted.

In support of his position, plaintiff cites to O'Donnell v. Harris Cty, 2016 U.S. Dist. LEXIS 174628 (S.D. Tex. Dec. 16, 2016) arguing that the court denied the motion to dismiss claims against the county judges. Plaintiff's cite to O'Donnell and state that the Southern District of Texas explained the Monell policy or custom doctrine and found: (1) promulgating the written Rules of Court; (2) overseeing and enforcing the alleged unwritten policies; and (3) acquiescing in the Hearing Officers' unwritten customs or practices by refusing to correct them in the written policies, the County Judges act in a legislative or administrative capacity to set policy for Harris County. Plaintiff misconstrues the Fifth Circuit jurisprudence, but more importantly, the rule of absolute judicial immunity is controlling in the Third Circuit. Plaintiff has cited no case law demonstrating that the Third Circuit follows the plaintiff's construction of the law of the Fifth Circuit which, in plaintiff's interpretation, weakens judicial immunity.

In any event, the court in O'Donnell provides a lengthy discussion regarding judicial immunity, which is similar to the instant case. In O'Donnell, the court stated that in Harris v. City of Austin, 2016 U.S. Dist. LEXIS 33694 (W.D. Tex. Mar. 16, 2016), the court noted that "the proposition that a municipality may be held liable based on the actions of a municipal judge where those actions are not an exercise of the judge's 'authority under state law,' but rather, are an exercise of some other type of non-judicial power conferred by the municipality, is unobjectionable." Id., 2016 U.S. Dist. LEXIS 33694, at *6. The court found that the challenged Austin Municipal Court Rules were not municipal policy, but rather "the promulgation of rules for the orderly trial of cases," and that these rules were "more judicial than non-judicial in nature." Id., 2016 U.S. Dist. LEXIS 33694, at *7.

3

The Court in O'Donnell also noted that in Davis v. Tarrant County Tex., 565 F.3d 214 (5th Cir. 2009), Johnson v. Moore, 958 F.2d 92 (5th Cir. 1992), and Harris, supra, the court described different circumstances involving judicial immunity. The Harris court noted that the challenged rules in that case were "issued by judicial order signed by the Presiding Judge" and "contemplate the exercise of judicial discretion, as they do not mandate that municipal judges take any particular action with respect to any defendant." Id., 2016 U.S. Dist. LEXIS 33694. The Harris County Criminal Courts at Law Rules of Court are not promulgated by a single judge's signed order. The Rules of Court are promulgated by the County Judges sitting en banc as a board, voting by two-thirds majority. See TEX. GOV'T CODE § 75.403(f). The Rules of Court apply not to a single court but to all the courts across one of the largest and most populous counties in the United States. The Rules of Court do not merely regulate "the orderly trial of cases," as the Harris court found was true of Austin's municipal court rules. 2016 U.S. Dist. LEXIS 33694, 2016 WL 1070863 at *7. The Rules of Court mandate the use of secured financial bail; prescribe presumptions in certain misdemeanor cases; provide for the appointment of counsel; promulgate a code of judicial conduct; and instruct sheriffs, district attorneys, and other county officers in how to administer their tasks of imposing and collecting secured financial bail.

The Rules of Court, both as written and as amended by customs or practices, do not merely "contemplate the exercise of judicial discretion," as in Davis, Johnson, and Harris. The O'Donnell Court stated that to the extent the plaintiffs rely on the County Judges' decisions to affirm the Hearing Officers' adjudications of individual cases, these actions are taken in the County Judges' judicial capacities and cannot support § 1983 liability against Harris County. See Davis, 565 F.3d at 227; see also DeLeon v. City of Haltom City, 106 F.App'x 909 (5th Cir. 2004) (per curiam) (municipal judge's decision not to provide an indigency hearing in an individual

case did not establish municipal policy under § 1983); Whisenant v. City of Haltom City, 106 F.App'x 915 (5th Cir. 2004).

Plaintiff is incorrect that the holding in Figueroa v. Blackburn, 208 F. 3d 435 (3d Cir. 2000), does not apply to the instant case. In Figueroa, the Third Circuit held that in New Jersey a municipal court judge is imbued with absolute immunity for judicial acts. Figueroa was charged with disorderly persons offenses after sending a harassing letter and documents to two New Jersey Superior Court Judges who had handled his divorce and child custody dispute. When he appeared before Judge Blackburn, Figueroa stated that he was not there to enter a plea, but to challenge the jurisdiction of the Trenton Municipal Court. Before he could begin his argument, on three occasions Judge Blackburn directed him to turn off his tape recorder. Upon his failure to do so Judge Blackburn ordered that Figueroa be arrested and removed from the courtroom. As in Figueroa Judge McInerney is entitled to judicial immunity. He ordered plaintiff to pay his fine for his traffic violation. When plaintiff refused, Judge McInerney ordered that plaintiff be arrested and placed in jail for five days or until he paid the fine. The payment and collection of fines is a judicial function; therefore, judicial immunity applies.

In this case, all of the allegations against defendants must be dismissed on Summary Judgment under the Doctrine of Judicial Immunity. In plaintiff's Opposition, it is argued that Judge McInerney and the Township defendants are not entitled to judicial immunity because Judge McInerney, in setting the alleged policy, acted in an administrative capacity. In Figueroa, the Third Circuit noted that because Figueroa was brought before Judge Blackburn for the purpose of being arraigned, he was before her and dealing with her in her judicial capacity. The Court noted, "Ordering him to prison was a paradigm judicial act, and that act does not become non-judicial because it was wrong." Figueroa, 208 F. 3d at 443. Here, plaintiff was brought

before Judge McInerney for the purpose of payment of the fine imposed on him. When plaintiff refused to pay the fine, Judge McInerney was within his discretion to punish plaintiff. Figueroa demonstrates that the Third Circuit does not support the false "administrative" distinction argued by plaintiff's counsel.

As in Figueroa, where the Court noted that the Municipal Court Judge had jurisdiction over the disorderly person's offense,[1] Judge McInerney did not act in the complete absence of jurisdiction. The Third Circuit recognized that jurisdiction must be construed broadly where the issue is judicial immunity, so that where a municipal court has some subject matter jurisdiction, there is sufficient jurisdiction for immunity purposes. Figueroa, 208 F. 3d at 444 (citing, Barnes v. Winchell, 105 F. 3d 1111, 1122 (6th Cir. 1997). Everything Judge McInerney did in this matter was clearly within his jurisdiction, duties, and responsibilities as the BTMC Municipal Court Judge. It is irrelevant for purposes of jurisdiction whether the municipal court judge's determination was right or wrong. Figueroa, 208 F. 3d at 444.

Respectfully, based on judicial immunity, all of the claims asserted by plaintiff in his Complaint against Judge McInerney and the Township defendants should be dismissed with prejudice.

## II.   THE POWERS EXERCISED BY THE TOWNSHIP CONCERNING THE COURT ARE ALL SET BY STATUTE OR COURT RULE TO GUARANTEE THE SEPARATION BETWEEN THE TOWNSHIP GOVERNMENT AND THE JUDICIAL FUNCTION PERFORMED BY THE MUNICIPAL COURT

Plaintiff argues that defendants' alleged administratively-created policy belies any assertion that the Township is immune from liability because Judge McInerney has been appointed by the Township as an official policymaker. However, the Township cannot be liable

---

[1] In this case, Judge McInerney had jurisdiction over the motor vehicle and traffic law violations to which plaintiff pled guilty. See, N.J.S.A. 2B:12-17.

for plaintiff's claims concerning alleged Township policies because the Township government possesses no authority over the municipal court, which is a part of the state judicial system and the plaintiff has presented no facts to support the existence of any unconstitutional policies. All of the actions plaintiff's counsel references as linking the Township government to the BTMC are in fact statutory or judicial functions that are required to be performed by either the municipal government and/or municipal court.

Contrary to plaintiff's assertions Township Administrator Corter never testified that he conducted investigations against municipal court staff in his capacity as administrator. (See Exhibit "20" attached to Judge McInerney's Opening Brief, p.30:7-15; pp. 50-52.) Corter, recognizing the limited authority of the Township with regard to the BTMC, in response to Dr. Kneisser, stated that no such authority existed to investigate his complaint regarding Judge McInerney and directed Dr. Kneisser to the judicial conduct board. (See Exhibit "24" attached to the Township Defendants Opening Brief.) There is also no testimony that Corter was involved in the annual audit of the municipal court. (See Exhibit "50" attached to Township Defendants Opening Brief, pp. 52:9-53:17)

In terms of plaintiff's arguments regarding Township revenue, the Township is required to have a municipal court. N.J.S.A. 2B:12-1. Statutes governing municipal courts are general laws applicable to the Township. N.J.S.A. 40:69A-28. McInerney has been appointed BTMC judge since 1990 by Mayors Foy, George and Carlin, as in the Township's Faulkner Act mayor-council form of government the mayor appoints the municipal court judge with the advice and consent of the Council. N.J.S.A. 2B:12-4. The BTMC judge serves as the "administrative head" of the BTMC responsible for performing the statutory duties of judge in accordance with AOC dictates. Township Code § 20- 47A(5)(e). As BTMC Judge McInerney is the only person who

has the authority to incarcerate a defendant, impose a fine, permit payment of fines in installments or permit community service. N.J.S.A. 28:12-22 to 28:12-23.1.

The Township is also required to provide "suitable courtrooms, chambers, offices, equipment and supplies for the municipal court, the administrator's office and its violations bureau," in addition to hiring a municipal court administrator and necessary employees, and providing for their compensation. N.J.S.A. 28:12-10; N.J.S.A. 28:12-15. Judicial control over the operation of a municipal court extends to recordkeeping and facilities as the Supreme Court "may prescribe records to be maintained and reports to be filed and may promulgate standards for facilities and staff of municipal courts." N.J.S.A. 28:12-25.

The position of municipal court administrator is under the control of the Supreme Court of New Jersey. A municipal court administrator is required to hold a municipal court administrator certificate issued by the Supreme Court. The Municipal Court Administrator Certification Board, which is appointed by the New Jersey Supreme Court, may revoke or suspend a certificate "for dishonest practices or failure to perform, or neglect of, duties of a municipal court administrator." N.J.S.A. 28:12-11 (a), (d) and (h). Revocation or suspension may result from " a conviction of a crime or disorderly or petty disorderly persons offense, for a violation of the 'Code of Conduct for Judiciary Employees,' or for dishonest practices, including conduct unbecoming a public employee or failure to perform, or neglect of, the employee's duties." N.J. Court Rule 1:41-4(a).

Here, plaintiff is incorrect in his assertion that the Township has a pattern of disregarding the New Jersey Court Rules and ethical canons designed to limit both perceived and actual conflicts of interest between the Township and/or Burlington City by alleging that the two municipalities share one municipal court. In reality, the City of Burlington and Township of

Burlington have two separate courts operating under a shared service agreement. Further, the Township recognizes the separation of powers between the municipal government and the municipal court. As demonstrated by the testimony of Mayor Carlin, former Mayor George and Township Administrator Corter, the administration only interacts with the municipal court in the limited areas in which the municipal government is permitted to interact - budgeting, provision of facilities and personnel.

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

In Monell v. Department of Social Services Of The City Of New York, 436 U.S. 658, 690-691 (1978), the Supreme Court held that municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Liability could also result from "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." However, municipal liability will not result unless "action pursuant to official municipal policy of some nature caused a constitutional tort" as "a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."

In <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986), a plurality opinion, the Supreme Court held that municipal liability under Section 1983 can exist in the limited circumstance "where ... a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing a final policy with respect to the subject matter in question." In another plurality opinion, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988), the Supreme Court interpreted <u>Pembaur</u> as defining "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy," and determined that <u>Pembaur</u> set forth the following guiding principles: "First, ... municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered. Second, only those municipal officials who have final policymaking authority may by their actions subject the government to §1983 liability. Third, whether a particular official has final policymaking authority is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." <u>Id</u>. at 123.

Plaintiff cites to <u>Cherrits v. Village of Ridgewood</u>, 311 <u>N.J. Super</u>. 517 (App. Div. 1998), stating that it is specifically recognized that policymaking functions may be separate or shared when it comes to law enforcement. However, in <u>Cherrits</u>, with regard to claims that the municipality had a policy of depriving Democrats of their constitutional rights, other than "bare allegations" the Appellate Division affirmed the granting of summary judgment because, similar to the claims in the instant case brought by plaintiff, the plaintiff in <u>Cherrits</u> failed to provide any proof other than his own arrest to support the existence of such a policy. <u>Cherrits v. Village of Ridgewood</u>, 311 <u>N.J. Super</u>. at 527. Importantly, the police function is an executive function

entrusted to municipal government. The municipal court function is not a municipal function entrusted to municipal government as recognized in the statutes, case law and importantly the Township Code. Every municipal and judicial employee, i.e., municipal court employee, testified as to the existence of the wall between the municipal government and the BTMC.

Here, plaintiff has not provided any facts to establish that the Township had any knowledge of any alleged unconstitutional policy, or that that Judge McInerney was under the direction of any mayoral administration to increase revenue. The Matthews sign was posted for less than one year and was removed when Judge McInerney learned of its existence. Neither Carlin nor Corter were aware of the sign's existence. Increased revenue from the municipal court would have a negligible impact on the municipal budget. Such revenue fluctuates due to factors beyond the control of the municipal court. (See Exhibit "20" to Township Defendants Opening Brief, p. 41:17--42:4; "Exhibit 30")

Also, plaintiff has not presented any facts to demonstrate that the Township had any knowledge of any alleged unconstitutional policy or had interfered in the operation of BTMC for the purpose of increasing revenue. Simply stated, the Township cannot be responsible for that which it did not have the power to authorize, or have control over, as the judicial function is not within the province of Township government.

Plaintiff places reliance on the personal relationship between Deputy Municipal Court Administrator Brittany Stevenson, and City of Burlington Police Officer John Fine, to suggest the absence of a wall between the BTMC and the Township government. Plaintiff asserts that the relationship evidences a conflict of interest in Stevenson's duties as Deputy Court Administrator in the Township. However, attention is called to the Affidavit of Brittany Stevenson of June 26, 2017 to refute Plaintiff's assertions. (Exhibit "A")

Deputy Municipal Court Administrator Stevenson during the spring of 2007 began serving the Burlington City Municipal Court as a sound recorder/filing clerk. Her job as a sound recorder/filing clerk was temporary and lasted only a few months. During her time as a sounder recorder/filing clerk, she met Officer Fine outside of the office and learned that he was a Police Officer in Burlington City. Officer Fine and Stevenson dated a few dimes during the summer of 2007. They resumed dating around March of 2008. During that time, Stevenson was made aware by an employee of the Burlington City Municipal Court that a position was opening in the court office and was urged to apply for the position by City of Burlington Court Administrator Elizabeth Fitzpatrick. Stevenson interviewed for the position and completed an application through the Civil Service.  Stevenson was hired full-time by the Burlington City Municipal Court around June of 2008. (Exhibit "A" paragraphs 1-8)

At the time Stevenson applied for and was hired full-time by the Burlington City Municipal Court, City of Burlington Court Administrator Fitzpatrick was aware of her relationship with Officer Fine.  In 2009, Burlington City Municipal Court Judge Joseph Montalto was made aware of Stevenson's dating relationship with Officer Fine and specifically instructed her not to handle any of Officer Fine's cases.  Between 2009 and 2010, the Burlington Municipal Division was also made aware of Stevenson's dating relationship with Officer Fine. City of Burlington Court Administrator Fitzpatrick was advised by the Municipal Division that Stevenson's relationship with Officer Fine would not interfere with her position with the court as long as she did not handle Officer Fine's cases or deal with Officer Fine directly concerning any court matters. (Exhibit "A" paragraphs 10-14)

Stevenson returned from maternity leave to the City  of Burlington Municipal Court during September 2013.  The City and Township had entered into a shared service agreement to

12

permit the City of Burlington Municipal Court to be conducted in the Township of Burlington Municipal Building. In October of 2013, through a civil service approved intergovernmental transfer, Stevenson became an employee of the Township as all staff serving the City of Burlington Municipal Court were now Township employees. The Judge of the City of Burlington Municipal Court was now the Honorable Dennis P. McInerney. During her deposition on January 6, 2017 Stevenson was not questioned regarding her relationship with City of Burlington Police Officer Fine. Had she been questioned Plaintiff would have learned that Stevenson had never been involved in any case in which Officer Fine was involved. (Exhibit "A" paragraphs 18-19)

Plaintiff's reliance on the relationship between Brittany Stevenson and City of Burlington Police Officer Fine for the purpose of demonstrating that a wall does not exist between the Township government and the BTMC is without merit as Fine is a City of Burlington police officer; the relationship, which commenced well in advance of the shared service agreement, has been disclosed to the judiciary, and Stevenson has never been involved in a matter in which City of Burlington Police Officer Fine has been involved.

## CONCLUSION

For the reasons expressed above and for the reasons expressed in the Opening Brief, it is respectfully submitted that an Order for Summary Judgment should be entered in favor of the Township defendants, , dismissing plaintiff's Complaint, with prejudice, and without costs to the parties.

**DAVID M. SERLIN, ESQUIRE**
Attorney for Defendants Township of Burlington, Township of Burlington Municipal Court and Dennis McInerney, Burlington Township Municipal Court Judge in his official capacity and John Docs 1-10

BY: _____
        DAVID M. SERLIN

Dated:  June 26, 2017

**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**
John L. Slimm, Esquire
Attorneys for Defendant, The Honorable Dennis P. McInerney, Individually

*S:\MyFiles\BT2015-34\BT CA Reply Brief - Twp*

14