ANTHONY KNEISSER,

                    Plaintiff,

          v.

HON. DENNIS P. MCINERNEY,
J.S.C., individually and in
his official capacity as
Municipal Court Judge of
Burlington township Municipal
Court, TOWNSHIP OF
BURLINGTON, TOWNSHIP OF
BURLINGTON MUNICIPAL COURT,
JOHN DOES 1-10,

                    Defendants.

1:15-cv-07043-NLH-AMD

**OPINION**

**APPEARANCES**:

ALEXANDER R. SHALOM
JEANNE LOCICERO
ALEXI MACHEK VELEZ
AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION
89 MARKET STREET, 7TH FLOOR
P.O. BOX 32159
NEWARK, NJ 07102

MARGUERITE KNEISSER
CARLUCCIO LEONE DIMON DOYLE & SACKS LLC
9 ROBBINS STREET
TOMS RIVER, NJ 08753

          On behalf of Plaintiff

DAVID MALVIN SERLIN
505 SOUTH LENOLA ROAD
SUITE 120
MOORESTOWN, NJ 08057

          On behalf of Defendant Hon. Dennis P. McInerney in his
          official capacity, Township of Burlington, and Township of
          Burlington Municipal Court

JOHN L. SLIMM
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, PC
WOODLAND FALLS CORPORATE PARK
200 LAKE DRIVE EAST
SUITE 300
CHERRY HILL, NJ 08002

On behalf of Defendant Hon. Dennis P. McInerney in his
individual capacity

**HILLMAN**, District Judge

This matter concerns Plaintiff's claims that his
constitutional rights were violated at the Township of
Burlington Municipal Court when he was sent to jail because he
was unable to pay a fine imposed for a littering offense.
Pending before the Court are Plaintiff's and Defendants' motions
for summary judgment, as well as Plaintiff's motion to amend his
complaint to add the court administrator as a defendant.  For
the reasons expressed below, the Court will grant Plaintiff
partial summary judgment, allow amendment, grant Plaintiff's
motion to seal, and will, on the present record, deny
Defendants' motions for summary judgment.

## BACKGROUND

Plaintiff, Anthony Kneisser, filed this action against
Defendant, Dennis P. McInerney, J.S.C. ("Judge McInerney"), the
Presiding Judge of all municipal courts in Burlington County,
New Jersey, the Township of Burlington ("Township"), and the
Township of Burlington Municipal Court ("Municipal Court"),
alleging that Defendants violated his civil rights under the

Fourth, Fifth, Sixth, and Fourteenth Amendments to the
Constitution of the United States and the Constitution of the
State of New Jersey. Plaintiff has also lodged claims against
Defendants under New Jersey state law for unlawful imprisonment,
intentional infliction of emotional distress, false arrest and
false imprisonment.[1]

These claims arise from Plaintiff's appearance before Judge
McInerney at the Township's Municipal Court in May 2014 for a
summons he received for throwing a cigarette butt from the
window of his car in violation of N.J.S.A. 39:4-64. The maximum
penalty for violating this statute is a fine ($200 minimum to
$1,000 maximum for each offense) which a defendant can satisfy
through the mail, over the phone, or online. At the time,
Plaintiff was a twenty year-old college student employed part-
time as a line cook making $9.00 an hour. He worked
approximately 15-20 hours per week making about $150 each
paycheck. Plaintiff alleges he lacked sufficient funds to pay
the imposed fine in full prior to the hearing date set on his
summons and called the Municipal Court to determine whether
there were any alternatives to paying the fine in full. He was
advised that because he could not pay the fine in full, an

---

[1] Plaintiff's proposed amended complaint adds these same claims
against the Municipal Court's administrator, Rosa Henry.

appearance in court was required.

The details of what occurred at the Municipal Court are set forth in Plaintiff's complaint.  On May 27, 2014, Mr. Kneisser appeared before Judge McInerney in the Burlington Township Municipal Court for his first appearance to plead guilty and request a payment plan or community service in order to satisfy the charges in full.  The entire amount of the offense, with court costs and fees, was $239.  When Mr. Kneisser entered the courtroom, he first spoke to the Municipal Prosecutor to request payment alternatives.  He was advised by the Prosecutor to make his request to Judge McInerney.

Mr. Kneisser sat and waited for his name to be called. During this time, Judge McInerney rendered his opening remarks as follows:

> After your case is heard you'll be asked to check out with
> the administrator. The administrator is out at the window
> where everyone checked in, everyone that has a case here
> today needs to check out with the administrator before you
> leave the court house. If a fine is imposed in your case
> the fine is due today. If you're not prepared to pay the
> fine, you need to make a phone call, make whatever
> arrangements are necessary so you'll be in a position to
> pay your fine today. If you refuse to pay your fine, I will
> sentence you to the county jail. Now the court does accept
> credit card payments, so we try to make it as convenient as
> we can for you to pay your fine. On the other hand, as I
> said, if you refuse to make a payment, I'll sentence you to
> the county jail.

(May 27, 2014 Hearing Transcript, pp. 5-6).

Mr. Kneisser then appeared before Judge McInerney, at which

time Judge McInerney asked how he wished to plea. Mr. Kneisser
indicated that he wished to plead guilty but that he was present
to determine whether there was an alternative to paying the fine
in full on that date. Such alternatives included performing
community service or being placed on a payment plan. Judge
McInerney advised that there would be no penalty imposed other
than a fine due in full and ordered him to return to the payment
window to pay. Specifically, Judge McInerney stated as follows:

> THE COURT: Anthony, it looks like Kneisser, come on up,
> sir. You're charged with throwing an object from the
> vehicle. There's a $100 fine for that – actually, there's a
> $200 fine for that offense. You have the right to be
> represented by a lawyer. If you can't afford one, you can
> apply to have one appointed. Do you understand that?
>
> MR. KNEISSER: Yes.
>
> THE COURT: Are you ready to proceed without a lawyer?
>
> MR. KNEISSER: Yes.
>
> THE COURT: How do you wish to plea?
>
> MR. KNEISSER: I mean, I'm guilty, but I was hoping there's
> a way to avoid the fine. Can I do some community service or
> something?
>
> THE COURT: No. There's no way to avoid the fine. What did
> you throw out of the vehicle?
>
> MR. KNEISSER: Cigarette butt on the turnpike.
>
> THE COURT: All right, there's a $206 fine, $33 court costs.
> The statute specifically mentions cigarettes and cigarette
> butts.
>
> MR. KNEISSER: All right.
>
> THE COURT: It's a $206 fine, $33 court costs. Either you

use an ashtray or quit smoking. Check out at the window.
(May 27 Tr., p. 8, ¶1-3).

Mr. Kneisser acquiesced and returned to the Clerk's window.
At the window, the Burlington Township Municipal Court's payment
policy was clearly expressed in a posted sign.  It stated as
follows:

**PLEASE NOTE:**

<u>IF YOUR FINES TOTAL OVER $200:</u>

YOU ARE REQUIRED TO MAKE AT

<u>LEAST</u>

A $200 PAYMENT TODAY

<u>IF YOUR FINES TOTAL $200 OR LESS:</u>

YOU ARE REQUIRED TO PAY YOUR

FINE <u>IN FULL</u> TODAY


Mr. Kneisser advised the Clerk that he was unable to pay
the minimum $200 required fine and was given a "Financial
Questionnaire to Establish Indigency" to fill out.  Mr. Kneisser
filled out the form and requested a payment plan.

Mr. Kneisser then returned to the courtroom, at which time
the following brief colloquy took place:

THE COURT: Anthony Kneisser. Come on up, sir. You have 239,
how much are you paying today?

MR. KNEISSER: I don't have anything today.

6

THE COURT: When can you make a payment?

MR. KNEISSER: Early June.

THE COURT: I'm sorry?

MR. KNEISSER: Early June.

THE COURT: You need to make a payment today, sir. Go make a phone call.

MR. KNEISSER: I don't have anyone that (indiscernible).

THE COURT: All right. I'll sentence you to five days in jail. Go with the officer.

MR. KNEISSER: Really.

THE COURT: Really. I gave you a chance to make a phone call, sir.

MR. KNEISSER: I don't have any friends that could help me out – –

THE COURT: All right. Well then you do the time. You're refusing to pay.

(May 27 Tr., p. 8).

Mr. Kneisser was arrested, handcuffed, escorted by two

officers to the Burlington Township Jail, waiting to be

transferred to the Burlington County Prison.[2]

---

[2] According to Plaintiff's Local Civil Rule 56.1 statement of material facts not in dispute:

> 66. Upon Judge McInerney's order, Officer Shawn McDonough handcuffed Plaintiff in open court and escorted him to the adjacent police department for booking.

> 67. During booking, McDonough subjected Plaintiff to "secondary search," or full search, as opposed to a frisk.

> 68. All of Plaintiff's property, including his shoelaces,

(Complaint, Docket No. 1 at 4-8.)

Based on what transpired, Plaintiff claims that:

(1) there was no refusal to pay; (2) at no point did Judge

---

was then inventoried and seized by the Burlington Township Police.

69. Plaintiff's seized property was: a car key; his shoe laces; and eleven cents.

70. Plaintiff was then placed in a jail cell where he sat for several hours.

71. Eventually, Plaintiff was able to call his brother and explain that he was being held in a Burlington Township jail cell and would soon be transported to Burlington County Jail.

72. After receiving word that Plaintiff was being held in a jail cell and would be sent to the Burlington County Jail shortly, Dr. Kneisser [Plaintiff's father] called the Burlington Township Municipal Court to see what could be done to have his son released.

73. An employee of Burlington Township Municipal Court advised Dr. Kneisser that the only way Plaintiff would be released was if someone paid Plaintiff's fines and fees in full.

74. Plaintiff was released only after his brother hand-delivered a check written by their father, for the full amount of the fines and fees imposed against Plaintiff. Plaintiff was not released until nearly five (5) hours after Judge McInerney had ordered his arrest.

(Docket No. 35-3 at 7-8, internal references omitted.) The deposition of Plaintiff's father, George Kneisser, M.D., reveals that prior to the court hearing, Plaintiff told Dr. Kneisser about the ticket, and that after Dr. Kneisser lectured his son for smoking and throwing the cigarette butt, he made it clear to him that he would not pay for the ticket, and that he should do community service or whatever it took, as a way to teach a lesson on thinking to his son. (Docket No. 33-5 at 17-18, discussing Dr. Kneisser's deposition.)

McInerney attempt to determine whether and to what extent Plaintiff was able to pay; (3) Plaintiff would have been able to start paying on an installment plan when he was paid by his job on or about June 2, 2014; (4) when Plaintiff attempted to explain to Judge McInerney that there was no one he could call to make alternate arrangements, Judge McInerney refused to consider any explanation and ordered Mr. Kneisser to jail; and (5) Judge McInerney suppressed Plaintiff's testimony by interrupting him and refusing to allow Plaintiff the opportunity to explain his inability to pay.

Plaintiff claims that Judge McInerney's motive was clear. The only thing he was interested in was generating revenue for the Municipal Court, which was apparent from Judge McInerney's opening statement and the express written policy of the Municipal Court. Plaintiff claims that the Defendants' motives were further confirmed by the Court Administrator, Rosa Henry, who thereafter advised Plaintiff's father that the Court acts to "get their money as fast as they can," and that "it is all about collection," so that the Court can "get them while they have them" in order to prevent "issuing warrants, suspending driving licenses, chasing people, etc."

Plaintiff claims that Defendants' actions demonstrate an unconstitutional policy and custom to jail those offenders incapable of or unable to pay their fines on their hearing

dates.  Plaintiff asserts that Defendants' policy violates well-established principles of due process and equal protection by subjecting an individual defendant to a term of imprisonment without first affording them notice and an opportunity to be heard on whether and to what extent they are able to pay their fines.  Plaintiff further claims that the policy invidiously discriminates against indigent defendants in that it fails to take into consideration the financial circumstances of any individual defendant.  Plaintiff claims that the policy lacks any rational basis and fails to serve any penological objective, and it is used solely as a collection device and cannot be tolerated.

In addition to violations of due process and equal protection, Plaintiff claims that Defendants' policy unconstitutionally imposed a term of imprisonment as the penalty for violation of N.J.S.A. 39:4-64, which is a fine-only offense. Plaintiff also claims that his right to counsel was violated because he only indicated he was waiving his right to counsel with respect to his plea for littering, not for his right to be represented under threat of imprisonment.

Plaintiff has moved for summary judgment on his claims for violations of his Fourth, Sixth, and Fourteenth Amendment rights, and he has moved to amend his complaint to add claims against Municipal Court Administrator, Rosa Henry.  Judge

McInerney has opposed Plaintiff's motion, and has moved for summary judgment in his favor, arguing that the doctrine of absolute judicial immunity defeats all of Plaintiff's claims against him in his individual and official capacities.

The Township opposes Plaintiff's motion as well, and moves for summary judgment in its favor, arguing that in addition to Judge McInerney's absolute immunity, it cannot be liable for the acts of the Municipal Court because it is actually part of the state judiciary and the Township has no control over how the Municipal Court is operated. Henry has opposed Plaintiff's motion to add her to his complaint based on the untimeliness of his motion and the futility of adding her to the case.

## DISCUSSION

### A. Subject matter jurisdiction

This case arises under the United States Constitution and 42 U.S.C. §§ 1983, 1988. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367. The declaratory and injunctive relief sought by Plaintiff is authorized by 28 U.S.C. §§ 2201, 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

### B. Standard for Summary Judgment

Summary judgment is appropriate where the Court is

satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a

genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

The parties' arguments relative to the viability of Plaintiff's claims will be assessed in a certain order.  First, the Court will determine whether the events on May 27, 2014 demonstrate that Plaintiff's constitutional rights were violated, and concomitantly, whether the Defendants maintained a policy or practice resulting in the violation of Plaintiff's constitutional rights.  If so, the Court will address which Defendants may be held liable for those violations on the current record.

**1.   Whether Plaintiff's constitutional rights were violated and whether the Defendants maintained an unconstitutional policy or practice**

Plaintiff argues that when Defendants sentenced him to jail for no other reason than Plaintiff's inability to pay fines and fees, without any inquiry into Plaintiff's ability to pay, Defendants were acting upon their policy or practice, which is

to use arrest and jailing as leverage to secure same-day payment-in-full from municipal defendants who have indicated, on the record and through a signed certification, an inability to do so. Plaintiff further argues that the record reflects that it is Defendants' policy or practice to sentence certain municipal defendants who are unable to pay to jail; they are then held in Burlington Township jail cells where they are permitted to make a telephone call and ask for money, and only after already being held in jail, granted a hearing on indigency.

Judge McInerney disputes Plaintiff's characterization of what occurred on May 27, 2014, and he disputes that the Municipal Court has a policy to use incarceration as method for securing the payment of fines. Judge McInerney claims that he viewed Plaintiff's demeanor in the courtroom as disrespectful, and when Plaintiff asked about community service, he was "kind of playing the crowd," trying to get a reaction from the courtroom. Judge McInerney claims that he found Plaintiff to be disrespectful, refusing to pay his fine, and attempting to avoid payment by not being willing to make a phone call.

Judge McInerney claims he never intended for Plaintiff to actually go to jail, but rather speak to him again on the record later in the court session and come to an agreement on how he was going to pay the fine. According to Judge McInerney,

"[s]ometimes a defendant is asked to sit and wait until the end
of the Court session so that the Court can talk to them again,
similar to the case here." (Docket No. 45 at 14.) He also
claims that he has never had any communications with the
Township about generating revenue for the Township by way of
collecting fines in the Municipal Court. Judge McInerney
further relates that he was not aware of the sign posted at the
payment window, and had it removed immediately when he learned
of it.

The law that forms the basis of Plaintiff's constitutional
violation claims is firmly established.[3] The Fourteenth

---

[3] Plaintiff has brought his claims pursuant to 42 U.S.C. §
1983, which provides in pertinent part:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory,
subjects, or causes to be subjected, any citizen of the
United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress.

"By its terms, of course, the statute creates no substantive
rights; it merely provides remedies for deprivations of rights
established elsewhere." City of Oklahoma City v. Tuttle, 471
U.S. 808, 816 (1985). Thus, "[t]o establish a claim under 42
U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a
right secured by the Constitution and the laws of the United
States [and] that the alleged deprivation was committed by a
person acting under color of state law." Moore v. Tartler, 986
F.2d 682, 685 (3d Cir. 1993).

Plaintiff has also brought claims for violations of the New
Jersey Civil Rights Act, N.J.S.A. 10:6-2(c). In contrast to §

Amendment prohibits the enactment or enforcement of laws which "abridge the privileges or immunities of citizens of the United States" or "deprive any person of life, liberty, or property, without due process of law ... [or] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

The United States Supreme Court "has long been sensitive to the treatment of indigents in our criminal justice system," with Justice Black declaring in 1956 that "'there can be no equal justice where the kind of trial a man gets depends on the amount of money he has.'" Bearden v. Georgia, 461 U.S. 660, 664 (1983) (quoting Griffin v. Illinois, 351 U.S. 12, 19 (1956)). In that vein, "a State cannot convert a fine imposed under a fine-only statute into a jail term solely because the defendant is indigent and cannot immediately pay the fine in full." Id. (citing Tate v. Short, 401 U.S. 395 (1971)). If, however, a defendant has "willfully refused to pay the fine [] when he has the means to pay, the State is perfectly justified in using imprisonment as a sanction to enforce collection." Id.

---

1983, which provides remedies for the deprivation of both procedural and substantive rights, N.J.S.A. 10:6-2(c) provides remedies only for the violation of substantive rights. Tumpson v. Farina, 95 A.3d 210, 225 (N.J. 2014). Because Plaintiff has alleged substantive violations of his rights, both provisions provide vehicles for relief.

The Supreme Court has therefore directed that "a sentencing court must inquire into the reasons for the failure to pay." Id. at 673. If a defendant cannot "pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment," such as by extending the time for making payments, or reducing the fine, or directing that the defendant perform some form of labor or public service in lieu of the fine. Id. at 672. "To do otherwise would deprive the [defendant] of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment." Id. at 672-73.

The New Jersey Supreme Court also follows this reasoning, see State v. De Bonis, 276 A.2d 137, 145 (N.J. 1971) ("Both [Williams and Tate] make it plain that a defendant may not be jailed merely because he cannot pay a fine in full at once. We must therefore hold that, since the record before us does not reveal some adequate explanation, the municipal court erred in denying defendant an opportunity to pay the fine in reasonable installments."), and the New Jersey statute governing municipal courts has codified it, see N.J.S.A. 2B:12-23 ("[I]f a municipal court finds that a person does not have the ability to pay a penalty in full on the date of the hearing . . . , the court may

17

order the person to perform community service in lieu of the
payment of a penalty; or, order the payment of the penalty in
installments for a period of time determined by the court.").

A defendant's right to counsel is also well established.
The Sixth Amendment requires that "[i]n all criminal
prosecutions, the accused shall . . . have the assistance of
counsel for his defense."  U.S. Const. Amend. VI.  The
protections of the Sixth Amendment equally apply to municipal
violations.  See Argersinger v. Hamlin, 407 U.S. 25, 40 (1972)
(holding "that absent a knowing and intelligent waiver, no
person may be imprisoned for any offense, whether classified as
petty, misdemeanor, or felony, unless he was represented by
counsel at his trial"); State v. Hermanns, 650 A.2d 360, 365
(N.J. Super. Ct. App. Div. 1994) (quoting Rodriguez v.
Rosenblatt, 58 N.J. 281, 295, 277 A.2d 216 (1971)) ("[A]s a
matter of simple justice, no indigent defendant should be
subjected to a conviction entailing imprisonment in fact or
other consequence of magnitude without first having had due and
fair opportunity to have counsel assigned without cost."); State
v. VanRiper, 595 A.2d 516, 519 (N.J. Super. Ct. App. Div. 1991)
(quoting State v. Carey, 553 A.2d 844, 847 (N.J. Super. Ct. App.
Div. 1989)) ("A non-indigent defendant 'always has the right to
retain counsel if he should so choose . . . .'").

Also firmly established is a person's "right to be secure

in their persons, houses, papers, and effects, against
unreasonable searches and seizures, shall not be violated, and
no Warrants shall issue, but upon probable cause, supported by
Oath or affirmation, and particularly describing the place to be
searched, and the persons or things to be seized." U.S. Const.
Amend. IV. A search and seizure is not presumptively valid
simply because a judicial officer has issued a warrant. See
Messerschmidt v. Millender, 565 U.S. 535, 546–47 (2012) ("Where
the alleged Fourth Amendment violation involves a search or
seizure pursuant to a warrant, the fact that a neutral
magistrate has issued a warrant is the clearest indication that
the officers acted in an objectively reasonable manner or, as we
have sometimes put it, in objective good faith. Nonetheless,
under our precedents, the fact that a neutral magistrate has
issued a warrant authorizing the allegedly unconstitutional
search or seizure does not end the inquiry into objective
reasonableness. Rather, we have recognized an exception allowing
suit when it is obvious that no reasonably competent officer
would have concluded that a warrant should issue." (internal
citations and quotations omitted)).

The irrefutable evidence in this case shows that
Plaintiff's fundamental constitutional rights were violated in
four ways: (1) Despite having explained to Judge McInerney that
he was indigent and having completed the "Financial

Questionnaire to Establish Indigency" form that he provided to the clerk at the payment window,[4] Judge McInerney did not follow U.S. Supreme Court and N.J. Supreme Court law or N.J.S.A. 2B:12-23 when he failed to consider Plaintiff's indigency and provide an alternative to immediate payment-in-full;[5] (2) Despite Plaintiff's guilty plea to a fine-only offense, Judge McInerney sentenced Plaintiff to five days in jail and ordered Plaintiff arrested and placed in a holding cell, which unconstitutionally converted the fine-only penalty into a jail term;[6] (3) Even though Plaintiff knowingly waived his right to counsel with regard to pleading guilty to the littering offense that only imposed a fine as a penalty, Plaintiff did not knowingly waive

---

[4] Defendants do not dispute that Plaintiff completed the indigency form, and they admit that it cannot be produced because it was destroyed.

[5] Defendants contend that because Judge McInerney only imposed the minimum fine for the offense, it is evidence that Plaintiff's indigent status was considered. That argument misses the point.

[6] Defendants argue that Judge McInerney's imposition of a prison sentence was proper because Plaintiff refused to pay the fine. The record does not support this position. Plaintiff repeatedly related his inability to pay the fine in full, and he asked for alternative arrangements – arrangements which were available to him under the law and the court's own municipal code. To hold that Plaintiff "refused" to pay under these circumstances would provide an easy excuse for judges to imprison indigent defendants, and completely undermine the law that protects indigents from such abuses. Moreover, there is absolutely no basis in the record to conclude that Judge McInerney held Plaintiff in contempt.

his right to counsel – to obtain his own or have one appointed to him due to his indigent status – for the imposition of a prison sentence.[7]

The fourth manner in which Plaintiff's constitutional rights were violated – arising from his search and placement in a jail cell – segues into the issue of whether the Municipal Court had (and still has) an unconstitutional policy and practice that results in these four separate constitutional violations. The evidence in the record reveals that the Judge, the court administrator and staff, and the court police officers perpetrated a policy and practice where defendants adjudged to pay a fine are required to pay it in full, or at least $200 if the fine is in excess of $200, at the court hearing. If they profess that they cannot pay their fine that day and even if the uncontroverted facts support that claim (or nothings undermines it), they are ordered to jail, and in Plaintiff's case, ordered to spend five days in jail. Those defendants are searched and placed in a jail cell, all the while Judge McInerney and the

_____

[7] See Brewer v. Williams, 430 U.S. 387, 404 (1977) ("We have said that the right to counsel does not depend upon a request by the defendant, and that courts indulge in every reasonable presumption against waiver. This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings." (internal citations omitted)).

other municipal court staff know – but the defendants do not – that the judge will recall them into the courtroom later in the day – if they have not secured payment for their fine in the meantime – and finally discuss alternatives to payment due to indigency.

This policy and practice effectively extorts payment from the family or friends of those indigent defendants, and violates their rights every step of the way by converting a fine-only penalty into punitive incarceration, by failing to provide indigent defendants with alternatives to full and immediate payment, by ignoring that these defendants have not waived their right to counsel relating to a jail sentence, and by issuing constitutionally infirm process to search and seize these defendants and place them in jail.

It is clear that Defendants' policy and practice was in effect for a long time, and it still may be. It is also clear that countless defendants' constitutional rights have been, and may continue to be, violated. Those defendants are not plaintiffs in this case, and Plaintiff has not instituted a class action complaint. Defendants' policy and practice is proven as applied to Plaintiff, however, which is more than sufficient to establish the practice's existence, and its constitutional infirmity.

Indeed, the state court hearing the appeal in the

underlying matter reached the same obvious, disheartening, even

shocking, conclusion.  Plaintiff appealed Judge McInerney's

sentence, and related actions, to the New Jersey Superior Court,

Burlington County, and his appeal was heard by Judge Thomas P.

Kelly on September 23, 2014.  As set forth in Plaintiff's

complaint, Judge Kelly found:

> THE COURT: The real question here is, was the – was
> the procedure that was employed after the guilty plea
> was accepted and the minimum mandatory fine, okay, by
> law, was imposed, was that according to law?
> Everything I've read says it was not. All right?  And
> State v. DeBonis we can start with.  And we can go on
> and on because, really, when a person comes before a
> Municipal Court Judge in any county in this state, and
> they indicate, after being imposed a fine of a penalty
> – and they indicate that they are indigent, that they
> cannot pay now, that they would like to – to have some
> time to pay, the Court has to give that consideration.
> And in this case I find that it did not amount to – to
> any consideration, frankly, of it.
>
> . . .
>
> THE COURT: Now the question here is, was that – was
> that the correct procedure as according to what we
> expect from our Courts in this state? And I think
> clearly the answer, after I read everything, is no.
>
> On issues regarding motor vehicle sentencing that are
> in the Municipal Court Practices, it says, "A
> defendant is entitled to a reasonable amount of time
> to pay his fines and costs. Indigent defendants
> convicted of traffic violations are permitted to pay
> their fines in installments."
>
> And collecting fines is a real problem in municipal
> courts. But the policies that one sets to collect
> fines must be consistent with the law. And DeBonis and
> its progeny and all the things that came out after it
> says under the facts of this case, you should have

been given a reasonable amount of time to pay that
fine, and you should have [walked] out of there with
something in your hand called a – a payment plan.

If you wish other relief from this, all right, talk to
your attorneys about your actions that you may have
civilly. All right? But this is not the place where I
can impose monetary penalties or fines on any Judge or
anything. I have no authority to do that. The
conviction was something you're not seeking to reverse
because, you know, you pled guilty. It was – it was
something you did. You admitted it was wrong. It was a
minor thing, really.

The – the results of this are – are so exaggerated by
the offense itself, it – it disturbs me as a Judge
that it came to this, frankly. But I must try to
remain undisturbed as best I can. But I do intend to
report this to the highest authority in this county
about this procedure, this policy, that on – on its
face appears to be not in line with the – the correct
legal procedures. And that's all I can offer you. And
I say so because I don't want to minimize this here. I
wouldn't want to be in your shoes on that day. And –
and frankly, people shouldn't be. And – and we'd like
to try to prevent it from happening again to anyone.
Especially a person who has not indicated in any way
an attitude of "I'm not paying." He – it was never
said. All he wanted to say is, give me some time, and
it just wasn't offered.

I'm not in the business of apologizing for some of my
brethren in the other courts of this state. I can tell
you, I sit on municipal appeals. Out of all of the
courts in Burlington County, I've never had this
before me before, but I – I know it happened because
it's right here. It's clear as day what happened. It
just shouldn't have went that way. I apologize on
behalf of the Judiciary. That's all I can do.

To the prosecutor, I just say, you heard me and you
understand me because it's the way it is right now.
We're going to see if we can effect a change in the –
in the policy. Unless I've missed something in the –
in the – all the writings about what to do when
somebody has no money to pay and what the procedure
should be, I think the procedure that was implied –

applied in this case was wrong and should be changed.
I'll see what I can do to change it. And I otherwise
have made my statements. I'm sorry. Okay? Counsel,
that's all I can do in my opinion.

(Docket No. 1 at 8-19; Docket No. 32-7 at 9-11.) (emphasis

added).

Thus, the next step in the Court's analysis is to determine

which, if any, Defendants may be held liable for the

unconstitutional policy and practice and their actions in

carrying out that practice.

### 2. Who can be held liable for the constitutional injuries to Plaintiff

#### a. *Township of Burlington*

Municipalities and other local government units are

included among those "persons" to whom § 1983 applies, and local

governing bodies can be sued directly under § 1983 for monetary,

declaratory, or injunctive relief.  Monell v. Department of

Social Services of City of New York, 436 U.S. 658, 690 (1978).

A municipality, however, cannot be held liable "solely because

it employs a tortfeasor - or, in other words, a municipality

cannot be held liable under § 1983 on a *respondeat superior*

theory." Id. at 691.  Instead, "it is when execution of a

government's policy or custom  . . . inflicts the injury that

the Government as an entity is responsible under § 1983."  Id.

at 694.  In order to hold a municipality liable for

constitutional injury, a plaintiff is required to establish

either: "(1) the existence of an officially promulgated authority, or (2) that the practices of city officials causing the alleged deprivation were "'so permanent and well-settled'" as to have the "'force of law.'"  Anela v. City of Wildwood, 790 F.2d 1063, 1066 (3d Cir. 1986) (quoting Monell, 436 at 691).

Township of Burlington argues that it cannot be liable for what occurred to Plaintiff in the Municipal Court under two theories.  One theory is that Judge McInerney is entitled to absolute judicial immunity for his actions, a defense advanced by Judge McInerney himself,[8] and if Judge McInerney is immune from suit, the Township cannot be held liable.  This theory is unavailing because even if Judge McInerney were entitled to absolute immunity,[9] Plaintiff's claims against the Township arise from a policy and practice of the Township itself, through Township employees and its Municipal Court, and not on a *respondeat superior* theory for Judge McInerney's individual

---

[8] Judges are generally "'immune from a suit for money damages.'" Figueroa v. Blackburn, 208 F.3d 435, 440 (3d Cir. 2000) (quoting Mireles v. Waco, 502 U.S. 9, 9 (1991); Randall v. Brigham, 74 U.S. (7 Wall.) 523, 536 (1868) ("This doctrine is as old as the law, and its maintenance is essential to the impartial administration of justice.")).  A judge's immunity from civil liability "is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. (citation and quotations omitted).

[9] As discussed below, the Court reserves decision on this issue.

actions.  See Monell, 436 U.S. at 694 (explaining that to establish municipal liability, a plaintiff must show that it tolerated or adopted an unofficial custom that results in the unlawful stripping of constitutional rights); Barna v. Board of School Directors of the Panther Valley School District, 877 F.3d 136, 145 n.6 (3d Cir. 2017) (fact that officer has qualified immunity standing alone does immunize municipality for liability since governmental entity not entitled to qualified immunity). The analysis is a separate one.  The district court must assess municipal liability distinct from the claims against individual officers.  Fagan v. City of Vineland, 22 F.3d 1283, 1294 (3d Cir. 1994); Barna, 877 F.3d at 145 ("'[P]recedent in [the 3d Circuit] requires the district court to review the plaintiff's municipal liability claims independently of the section 1983 claims against the individual officers.'") (quoting Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996)).

The Township's other theory is that the Municipal Court is actually part of the state judiciary and there is effectively a wall between the Township and the Municipal Court.  The Township extensively cites to the New Jersey statute that governs the creation and operation of the municipal court system, see N.J.S.A. 2B:12-1 et eq., and maintains that its only involvement with the Municipal Court is with budgeting, facilities, and personnel.  The Township argues that it has no authority over

the judicial function of the court, including the imposition of sentences or collection of fines. Because the Township has no involvement with the actions that form the basis of Plaintiff's claims, the Township contends that it cannot be held liable for what occurs in its Municipal Court.

This Court does not agree with the Township under the established facts in this case. As a primary matter, the Court does not question the general view that a municipal court is considered a part of the state judicial system, or that a municipality is ordinarily not liable for the actions of its municipal court judge in the exercise of his or her judicial duties. See K.D. v. Bozarth, 713 A.2d 546, 550 (N.J. Super. App. Div. 1998) (quoting Kagan v. Caroselli, 153 A.2d 17, 20-21 (N.J. 1959)) ("A magistrate does not exercise the 'judicial' power, authority, or duty of a municipality. On the contrary, his court is an integral part of a state-wide judicial system, and the judicial power he exercises is the judicial power of the State."); State v. Martens, 2016 WL 7102736, at *4 (N.J. Super. Ct. App. Div. Dec. 6, 2016) (quoting Kagan, 153 A.2d at 22) ("The New Jersey Constitution established our court system and vested judicial power in the Supreme Court, Superior Court and 'other courts of limited jurisdiction' which 'may from time to time be established.' N.J. Const. art. VI, § 1, ¶ 1. Pursuant to this authority, municipal courts were established by N.J.S.A.

2B:12-1.  Although municipal court judges are appointed by a
mayor or governing body, N.J.S.A. 2B:12-4(b), the appointment
power does not render the functions of a municipal court judge
'a phase of local government. Rather in exercising the
appointive power, the governing body acts merely as a statutory
agent.'").

The situation here falls outside those general
propositions, however.  A case directly on point with this one
is Anela v. City of Wildwood, 790 F.2d 1063, 1065-67 (3d Cir.
1986).  In Anela, ten people were arrested by City of Wildwood,
New Jersey police officers at 11:15 p.m. for "loud radio
playing."  They were brought to the police station and placed in
cells.  The one male arrestee provided $200 cash, was released,
and he later returned with $700 to release the others on bail.
The female arrestees were not released and were held in cells
until 11:00 a.m. the next morning.  Anela, 790 F.2d at 1064.

Several of the female arrestees filed suit against the City
of Wildwood under § 1983, claiming that the City was liable for
the violation of their constitutional rights, including that the
length and condition of their confinement violated their
fourteenth amendment rights, that the release of the one male
arrestee on bail violated their rights to equal protection, and
that their arrest without probable cause violated the fourth and
fourteenth amendments.  Id. at 1064-65.  On appeal from the

district court which ruled against them, the Court of Appeals for the Third Circuit reversed the district court's dismissal of the plaintiffs' claim that centered on the municipal court judge's decision to hold plaintiffs overnight rather than be released on a summons.  Id. at 1065.

The Third Circuit noted that the City "attempted to justify the detention of the plaintiffs on the basis of a bail policy statement prepared by the Judge of the Municipal Court of the city of Wildwood," and that the "trial court ruled that the Judge of the Municipal Court, in judicially adopting a bail policy, acted independent of the township's governing body," citing to Kagan v. Caroselli, 153 A.2d 17 (N.J. 1959).  Id. The Third Circuit related that "the district court held that the plaintiffs had not proven that the allegedly illegal bail policy was one emanating from the City," and the district court "concluded that the policy was not the City's but was the State's 'per the Municipal Court Judge.'"  Id.

After setting forth the standard to assert a policy or custom claim against a municipality under Monell, the Third Circuit noted that pursuant to New Jersey Court Rule, the plaintiffs should have been issued a summons in lieu of continued detention.  Id. at 1066 (citing N.J. Ct. R. 3:4-1(b), (c)).  The City argued that the Rule was "irrelevant because the procedure under which they routinely detained persons overnight

for minor offenses without issuing a summons was mandated by the 'Cash Bail Schedule' established on order of the Wildwood municipal judge."  Id.  The Third Circuit rejected this argument:

> Rule 3:4-1 specifically and unequivocally required the City to pursue a contrary policy.  It applied statewide, provided carefully drafted procedures to protect the legal rights of arrestees, and therefore imposed a duty upon Wildwood to issue summonses to these plaintiffs after the completion of the post-identification procedures, rather than to confine them in cells overnight.  Accordingly, the City of Wildwood's routine noncompliance with the controlling Rule 3:4-1 "could be ascribed to municipal decisionmakers," and amounted to a "policy" under Monell for purposes of section 1983 liability.

Id. at 1066-67 (internal citation omitted).

The Third Circuit continued:

> The Supreme Court has not fully developed the meaning of "policy" in this context, but it is sufficient that the wrong results from a practice - not an isolated act - that is attributable to a municipal policy maker.  The offending practice need not have the city's formal approval.  In this case, the City engaged in an offending practice: it acknowledges that it routinely followed the repugnant bail schedule and ignored Rule 3:4-1 when booking arrestees. This blatant and routine disregard by the city police of an applicable legal procedure designed to preserve the right of citizens detained in their custody amounts to a "policy" as construed by Monell.  At the very least, it amounts to a practice "so permanent and well settled" as to have "the force of law" and is ascribable to the municipal decisionmakers.

> The issuance of a bail schedule by the municipal court does not excuse City officials from complying with the New Jersey Supreme Court's rule.  Private citizens are presumed to know the law, and no less should be expected of public officials when they detain and confine persons.  See North Laramie Land Co. v. Hoffman, 268 U.S. 276, 283 (1924) ("All persons are charged with knowledge of the provisions of

statutes and must take note of the procedure adopted by
them....").  The City established a practice contrary to
Rule 3:4-1 and must bear responsibility therefor.  It was
therefore error to direct a verdict in favor of the City on
this issue

Id. at 1067.

If the New Jersey statute at issue here - N.J.S.A. 2B:12-
23.1, Inability to pay fine on date of court hearing;
installment payments; alternative penalties - were substituted
for the New Jersey Court Rule at issue in Anela, the Third
Circuit's decision would be the same.  Here, the Township,
through its employees - the Municipal Court staff and court
officers[10] - should have been aware of the "statewide" law which
affords alternative arrangements to indigent defendants who are
charged with a fine.

Instead, just like the City of Wildwood's police officers,
the Township employees followed an alternative procedure in
complete contravention of the New Jersey statute, including
posting a sign about minimum payment obligations, apparently
ignoring indigency forms, and searching and jailing indigent
defendants simply because they could not pay.  Even though it is
unclear at this point how this "repugnant practice" came to be,
the evidence readily demonstrates that the Township employees

---

[10] Defendants admit that the Township hires the employees for the
Municipal Court and that those employees are employed by the
Township.  (See, e.g., Docket No. 33-5 at 22.)

engaged in such an "offensive practice" that directly contradicted New Jersey law, and resulted in constitutional violations of Plaintiff, and every other defendant who has been treated similarly.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 484 n.10 (1986) ("A § 1983 plaintiff thus may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state 'custom or usage.'"). The Township, therefore, cannot escape liability for its employees' unconstitutional practice under the argument that there is a wall between it and the Municipal Court.

Another basis for imposing liability on the Township is that the Municipal Court can be considered an "arm" of the Township.  As pointed out by Plaintiff, despite its protestations that it only has a very limited interaction with the Municipal Court, the Township exercises significant control over many aspects of the Municipal Court.

The Third Circuit recently fine-tuned the test for determining whether one entity is an arm of the state in the context of Eleventh Amendment immunity, and that case is instructive here.  In Karns v. Shanahan, 879 F.3d 504 (3d Cir. 2018), the plaintiffs filed suit against New Jersey Transit Corporation and two of its officers alleging constitutional violations arising out charges imposed on the plaintiffs for

failing to have a permit to preach at a train station. In the district court, NJ Transit moved for summary judgment on the basis that it was the arm of the state and therefore entitled to sovereign immunity under the Eleventh Amendment, and the district court granted NJ Transit's motion on that basis. Karan, 879 F.3d at 511. The plaintiffs appealed, and the Third Circuit affirmed the district court.

The Third Circuit instructed that a court must equally balance three factors to determine whether an entity is an arm of the state: (1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has.[11] Id. at 513. The Third Circuit found that the first factor weighed against providing immunity to NJ Transit because the state was under no legal or other obligation to pay NJ Transit's debts or to reimburse NJ Transit for any judgments that it pays. Id. at 516.

For the second factor, the Third Circuit found that there was "considerable indication that New Jersey law considers NJ

---

[11] Previously, the Third Circuit held that the first factor was the most important factor, see Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (en banc), but in light of the Supreme Court's intervening precedent, Regents of the Univ. of Cal. v. Doe, 519 U.S. 425 (1997), the Third Circuit modified the "arm of the state" test to require the three factors to be balanced equally. See Karan, 879 F.3d at 513.

Transit an arm of the state," because: (1) NJ Transit is allocated within the Department of Transportation, which is a principal department within the Executive Branch of the State of New Jersey, and NJ Transit is statutorily constituted as an instrumentality of the state exercising public and essential governmental functions; (2) NJ Transit is considered state property for tax purposes and is exempt from state taxation; (3) NJ Transit officers are vested with general authority, without limitation, to exercise police powers and duties in all criminal and traffic matters at all times throughout the state; and (4) state case law also regards NJ Transit as an agency of the state. Id. at 517-18 (citations and quotations omitted).

The Third Circuit also found that the third factor weighed in favor of finding NJ Transit to be an arm of the state because the state has substantial control over NJ Transit, including: (1) being subject to several operational constraints by the New Jersey Legislature and the Governor, who is also responsible for appointing the entire NJ Transit governing board, which is composed of several members of the Executive Branch; (2) the Commissioner of Transportation, an Executive Branch official who is the chairman of the NJ Transit governing board, has the power and duty to review NJ Transit's expenditures and budget; (3) NJ Transit must annually report on its condition and its budget to the Governor and the Legislature and is subject to audit at any

time; (4) the Governor can veto any action taken by NJ Transit's governing board; and (5) certain of its acquisitions are also subject to legislative veto. Id. at 518 (citations and quotations omitted).

The Third Circuit concluded, "Weighing and balancing the qualitative strength of each factor in the context of the circumstances presented, we hold that NJ Transit is an arm of the state," and "therefore conclude that NJ Transit is entitled to claim the protections of Eleventh Amendment immunity, which in turn functions as an absolute bar to any claims in this case against NJ Transit and the officers in their official capacities." Id.

Even though the application of the Eleventh Amendment is not at issue in this case, the Third Circuit's "arm of" analysis supports the finding that the Township and the Municipal Court are not distinct, independent entities as the Township claims.[12]

---

[12] Plaintiff has named the Municipal Court as a Defendant, but the Municipal Court has not specifically moved for summary judgment. Even though the New Jersey state courts have been afforded Eleventh Amendment immunity from suits brought by New Jersey citizens in federal court under § 1983, see Abulkhair v. Office of Attorney Ethics New Jersey, 2017 WL 2268322, at *5 (D.N.J. May 24, 2017) (citing Johnson v. State of N.J., 869 F. Supp. 289, 296–98 (D.N.J. 1994); Hunter v. Supreme Court of New Jersey, 951 F. Supp. 1161, 1177 (D.N.J. 1996), aff'd sub nom. Hunter v. Supreme Court of N.J., 118 F.3d 1575 (3d Cir. 1997)), and, as noted above, the municipal courts are considered to be part of the state judiciary system, neither the Municipal Court nor the Township have argued that they are entitled to sovereign immunity, which is their burden to establish. See Carter v.

Relative to the Municipal Court, the Township acts as follows:
(1) selecting, appointing, and continually reappointing its
municipal judge, who is not entitled to tenure, unlike members
of the State Judiciary; (2) establishing salaries for the judge
and all court personnel; (3) granting or denying tenure to the
Court Administrator, which the Township has granted to Rosa
Henry; (4) overseeing the Municipal Court's budget; (5)
financing the court's budget; (6) supervising Municipal Court
Administrator Henry; (7) enforcing the Township's civil rights
policy with regard to the Municipal Court and its personnel; (8)

---

City of Phila., 181 F.3d 339, 347 (3d Cir. 1999) (explaining
that sovereign immunity is an affirmative defense, and the
burden of demonstrating the immunity lies on the party asserting
it); Kelly v. Pier, 2017 WL 3397030, at *7 (D.N.J. 2017)
(finding that because the Municipal Defendants pointed to no
evidence indicating that the municipal employees were "arms of
the state" subject to sovereign immunity, the Municipal
Defendants did not meet their burden to demonstrate that they
are entitled to sovereign immunity).  Moreover, to the extent
that the Municipal Court were to argue that it is immune from
suit, the Court would not find that argument availing in the
context of this case because here the Township is not the arm of
the Municipal Court, but rather the Municipal Court is the arm
of the Township, and the Township is not entitled to any
immunities to suit for its constitutional torts brought under §
1983.  See Owen v. City of Independence, Mo., 445 U.S. 622, 657
(1980) ("[M]unicipalities have no immunity from damages
liability flowing from their constitutional violations."); 
United States v. Washington, 869 F.3d 193, 220 (3d Cir. 2017)
(citing Owen) ("Claims of unconstitutional policies or
practices, lodged against entities rather than individuals,
often cannot be met with qualified or good-faith immunity
defenses at all.").

using Township evaluation forms and using Township employee evaluation procedures for Municipal Court staff; (9) having the apparent authority of the Township Administrator to investigate complaints against the Municipal Court; (10) the Township Administrator's participation in the annual audit of the Municipal Court; (11) the enforcement of Township human resources policies with regard to the Municipal Court and its employees; (12) the enforcement of the Township's "policies and procedures manual" and "employee handbook" over the Municipal Court and its employees; (13) the power to hire and fire Municipal Court personnel; (14) the fact that Mayor Carlin testified that he has observed the Municipal Court on more than one occasion to ensure that he's satisfied with the "produc[t] [the Township is] delivering" with regard to the Municipal Court; (15) monthly revenue reporting and distribution of payment by Court Administrator Henry to the Township; (16) the mandatory participation of Judge McInerney in annual Township Council budget meetings, where Judge McInerney is expected to present the Municipal Court's budgets, as is expected of the Township's department heads; and (17) reliance upon the Municipal Court for approximately one half million dollars in Township revenue per year.  (See Docket No. 51 at 19-20.)

State law considers the Municipal Court to be part of the state judicial system, see Kagan, 153 A.2d at 22, supra, but the

New Jersey statute that governs the Municipal Court, N.J.S.A. 2B:12-1 et seq., explicitly confers onto the Township numerous powers relative to the operation and management of the Municipal Court, which is similar to how New Jersey law governs NJ Transit's relation to the state. Additionally, as detailed above, it is evident that other than Judge McInerney's judicial decisions, the Municipal Court has little autonomy outside the Township's control.

Moreover, the case law since <u>Kagan</u> (1959) has evolved, where courts have observed the blurry line between a municipality and its municipal court. <u>See, e.g.</u>, <u>Ali v. City of Newark</u>, 2016 WL 3014401, at *6 (D.N.J. May 25, 2016) (denying motion to dismiss Plaintiff's civil rights violation claims against City of Newark regarding the municipal court's policy of not providing ASL interpreters for deaf defendants, noting, "It is premature for the Court to determine at this stage who is ultimately responsible for either the implementation or the setting of policy under the ADA, RA, and NJLAD in the Newark Municipal Court, the extent to which the Newark Municipal Court is 'independent' from the City or the State Defendants for purposes of liability, and whether sovereign immunity applies. The issues presented are novel, nuanced, and fact-intensive, and neither the City nor the State Defendants has convinced the Court one way or the other on the issues at this stage.").

Thus, it is evident that the Municipal Court can be considered an "arm" of the Township, and under the circumstances of this case, the Township can therefore be liable for the constitutionally violative practice that occurs in the Municipal Court under this theory of liability as well.

### 2. *Judge McInerney and Rosa Henry*

As noted above, see <u>supra</u> note 8, Judge McInerney argues that Plaintiff's claims against him must be dismissed because he is entitled to absolute judicial immunity. Plaintiff argues that Judge McInerney is not entitled to absolute immunity for his actions taken in his administrative capacity.

With regard to Plaintiff's motion to add the Municipal Court Administrator, Rosa Henry, to the action, Henry has opposed the motion, arguing that Plaintiff's motion is untimely, and it would be futile to add her because she has no authority to set policy, impose a fine, or cause a defendant to go to jail.

The claims against Judge McInerney and Henry involve the close scrutiny of each individual's actions relative to the Municipal Court's practice of disregarding the rights of the indigent defendants charged with fine-only offenses. <u>See</u> <u>Barna v. Board of School Directors of Panther Valley School District</u>, 877 F.3d 136, 145 n.6 (3d Cir. 2017)) (citing <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1213 (3d Cir. 1996); <u>Fagan v. City of Vineland</u>, 22

F.3d 1283, 1292 (3d Cir. 1994)) (explaining that claims against

an individual municipal employee must be analyzed separately

from the claims against the municipality).  The claims against

Judge McInerney and Henry also require the determination of

whether they are entitled to any sort of immunity.  See

Forrester v. White, 484 U.S. 219, 227 (1988) (explaining that

there is an "intelligible distinction between judicial acts and

the administrative, legislative, or executive functions that

judges may on occasion be assigned by law to perform," and the

latter acts are not afforded absolute immunity); Bankes v.

Felice, 2006 WL 1765074, at *6 (D.N.J. 2006) (quoting Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982)) (analyzing whether a

municipal court administrator was entitled to qualified

immunity, which doctrine provides that public officials

performing discretionary duties within the scope of their

employment are "shielded from liability for civil damages

insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person

would have known").  Plaintiff's claims against these

individuals may also be impacted by the Court's finding that the

Township is liable for the violation of Plaintiff's

constitutional rights.

    The Court concludes that this issue is not ripe for summary

judgment as disputed issues of material issues of fact prohibit

the Court from concluding on the present record as a matter of
law that Judge McInerney acted only as a judicial officer in
compelling payments from indigent defendants.  As we have
recounted, the record reveals that he was chosen by the
municipality to preside over the Court during the time it
instituted an unconstitutional policy, that he reported on
budget matters to the Township Council, that he directed
individuals to a payment window that displayed an
unconstitutional policy, that he directed defendants to find
someone else to pay their fines, that the Court clerk admitted
that the whole point of incarceration was to collect fines and
avoid the administrative complications of community service and
payment plans, and reconvened Court after the administrative
process failed to produce the coerced result.  Many of these
acts are extra-judicial and focus more on the administrative
task of collecting fines than the judicial act of imposing them.
The Court declines to grant summary judgment on absolute
judicial immunity on the current record at this time.

The comprehensive, organized, and official manner in which
this scheme operated for the benefit of the Township fisc also
compels the Court to grant the motion to amend to allow claims
against the Court Administrator.  As recounted above,
Plaintiff's father has testified that he was told by Henry that
the Court acts to "get their money as fast as they can," and

that "it is all about collection," so that the Court can "get them while they have them" in order to prevent "issuing warrants, suspending driving licenses, chasing people, etc." This is more than sufficient to make out a plausible claim against Henry for a violation of Section 1983. Even at this late day in the proceeding, the Court will allow the proposed amendment. In light of the Court's finding of a clear violation of the Plaintiff's constitutional rights and the remaining uncertainty as to what municipal officers if any should also be held responsible, amendment clearly serves the interests of justice. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

## CONCLUSION

Plaintiff has met his burden of providing sufficient undisputed material facts that prove his claims that his Fourth, Sixth, and Fourteenth Amendment constitutional rights were violated by a policy and practice employed by the Burlington County Municipal Court regarding the treatment of indigent defendants charged with fine-only offenses. No issues of disputed material facts exist so as to preclude that result. Plaintiff has also proven that the Township of Burlington is liable for those violations because the Municipal Court, as an arm of the Township and through the Township's employees, inappropriately substituted its own policy and practice for

43

well-established constitutional law and New Jersey state statute. Accordingly, Plaintiff's motion for partial summary judgment will be granted.

On other hand, Plaintiff's claims against the Municipal Court judge, Judge McInerney, will remain unresolved on the present record as disputed issues of material fact concerning Judge McInerney's role as administrator as opposing to presiding judge preclude a ruling as a matter of law. Finally, for the reasons stated the Court will grant Plaintiff's motion to amend to add Municipal Court Administrator, Rosa Henry, as a party defendant.[13]

An appropriate Order will be entered.


Date: March 30, 2018           s/ Noel L. Hillman
At Camden, New Jersey        NOEL L. HILLMAN, U.S.D.J.

---

[13] On the present record, the Court will grant Plaintiff's motion to seal at this time. Both parties are advised that this ruling is not the law of the case in the sense that the Court reserves the authority to unseal any previously sealed materials if necessary to protect the public's right of access to court records and if unsealing becomes necessary for a public resolution of the remaining issues in the case or for the issuance of a final judgment.